Good morning. May it please the Court, Michael Ram for Plaintiffs and Appellants, and here with me at council table is my colleague Mary Beth Lipsmith. If the Court please, I'd like to reserve five minutes for rebuttal. All right. Keep your eye on the clock, but I'll try to help you out. Yes, Your Honor. Three topics. First, what is this case about? Second, the motion for judgment on the pleadings with respect to the express warranty claim. And third, sanctions. First, what is this case about? Simpson Strong Tie Company told builders that its interior dry environments are the least corrosive to its safety ties, while the outdoor environments are the more corrosive. Maybe, I hate to interrupt you because I don't want you to get away from that argument, but I have a real problem about whether you have any standing here. I read your third party complaint. It alleges that the defendant's certain to prematurely fail. And then I read it says these connectors are not supposed to experience wear and tear that materially degrades them during the lifetime. And then it says the products are substantially certain to result in failures, not that they have failed. Why are these allegations not conclusory? They're not conclusory because among other things, we say, Your Honor, that they have failed thousands of times. Now, just a minute. Which homes have experienced damage? In our first amended complaint. I'm not going to go back to the first. That was the subject of the sanctions order, Your Honor. I understand. I'll talk about the sanctions order when I get there. I'm trying to see if you have any standing to bring this third amended complaint. In the record. I mean, which homes have already been experienced damage? What damage occurred? I understand, Your Honor. We allege that we've all been damaged because as homeowners, we paid more and got less. Are you going to go to the benefit of the bargain then? That is one of the arguments. Well, that's the one you've given thus far. What else do you have? Because I can go to benefit of the bargain. My worry was I went to the third amended complaint and I tried to find a place where I could find where you would have standing. Which homes were already damaged? What damage occurred? When did it occur? What repairs were needed? That's generally in a complaint and it's not there. Even in your reply briefing, you talk about the defects having manifested in other homes, not those of your clients. Never that you, your clients suffered the damage or already paid to fix them. My book is there's no standing. Well, Your Honor, please remember this is a product that's embedded in the foundation of the home so that if there's an earthquake. I know where it's embedded. I'm just trying to get you to tell me what the damage is. Yes, Your Honor. I think I'm struggling with the same issue. I understand your response that these products were embedded. Now, it may be difficult to show that they've already corroded, but showing that they've already corroded would be necessary to establish standing. Do you dispute that? I dispute that, Your Honor. So you don't need to allege that there's been corrosion in order to go forward with the complaint in order to establish standing? Yes, Your Honor. Let me please quote the district court, for example. The district court found UCL standing with respect to the third amended complaint saying plaintiffs have established standing. Well, let's set aside what the district court did, right? As I understand it, you do have to allege that there's been corrosion in order to establish standing. I don't see that you've alleged that in the complaint. I'd also add that we were not allowed leave to amend. It's outside the record that our experts have done testing, and as part of the class certification record, they've done testing. There is corrosion, but that's not in the complaint. I agree it's not in the complaint. If we are allowed to amend, which we should have been, we can say that. That's not accurate, Your Honor. Oh, okay. I thought three times. May I address that point, Your Honor? All I'm trying to do is get where do I look in your complaint to find what I need. Let's go to your benefit of the bargain damages. Where do you allege benefit of the bargain damages in your third amended complaint? In the third amended complaint, we say that these safety ties in our home are going to fail before the end of the useful life. This is paragraphs 26, 33, 39, 46, and 53. It's five excerpts of record 9013. Well, frankly, the reason I worried about this is that the builders were the ones making the bargain. Your clients weren't. Well, our clients paid for it. If someone didn't get a benefit, the builders didn't get it. Your allegations simply talk about avoiding buying the homes from ones from whom you purchased them. That's what your argument is. To me, just to be fair, that doesn't allege a benefit of the bargain. We are the third party beneficiary of the express warranty. The district court found that. We allege that. We're talking about benefit of the bargain here. The builders made a bargain. You bought from the builders, and all your allegations simply say is that you could avoid buying the homes from the builders from whom you purchased them. That's the best benefit of the bargain damage you've got. Well, Your Honor, a lot of manufacturers sell their products through intermediaries. Almost all manufacturers have wholesalers, distributors, retailers, and that's what happened here. We did not, as homeowners, buy directly from Simpson, but we bought homes, the most important asset in many people's lives, and paid our money. All of that I agree with. I just wanted to get your best argument that you would make about whether you had any standing at all, and especially on the benefit of the bargain damages. So you can go on with your other argument if that's the best you have. Okay. Well, I would. Can I actually – can I ask this? I thought one of your arguments in Reliance using Hicks was that you are establishing standing because there's an inherent design defect, and so there's something inherently defective about the structural ties right now. Yes, Your Honor. Under Hicks – Which is not a benefit of the – well, I don't know. Can you explain how you establish standing on those? Thank you, Your Honor. Under Hicks, first of all, we properly allege that a foundation should reasonably last the life of the home. That's Hicks, 89 Caleb 4th at 923, where the California court says a foundation's useful life is indefinite. But then, more directly to the court's point, Hicks – and this is what we allege – says if the defective is substantially certain to result in malfunction during the useful life of the product, that suffices. And the California court – and of course, if plaintiffs prove their foundations contain an inherent defect, which is substantially certain to result in malfunction during the useful life of the product, they have established a breach of express and implied warranties. And here, that's exactly what we've alleged,  But can you – just to be more specific, since we have to apply Article III standing in federal court, what is it about an inherently defective foundational product that gives you concrete and immediate injury or imminent harm? In other words, your friends on the other side point to transunion as why you don't have standing in federal court. Why are they wrong? Well, transunion – if the bad guys never see the disinformation that's not a problem for you, here. Right now, we are at risk. If there is an earthquake or when we had Florida in the case, in the first minute complaint, a hurricane, we're at risk right now. We have diminished value right now. And that is what the district court found, 1ER16, that there's economic loss from property damage and diminution in the home value. Now, when the district court found Article III standing in the second amendment complaint, the district court said, contains products with inherent defects substantially certain to result in failures during the product's useful life. Were we to sell the home now, we would have to disclose that there is a safety risk now because there is a defective product and it's a safety defect. And so that is the Article III standing and it dovetails with HICS, as your Honor is pointing out. When you move to breach of warranty – Yes, your Honor. Where in your complaint does it allege that the products were installed in conformance with the interior dry use spec as used in the catalog? Because you've alleged stuff, but we're really talking about the warranty that the defendant gave to you. Where does it allege that the products were installed in conformance with the interior dry use spec? And I read interior dry use spec because that comes right from the warranty. Your Honor, we allege that we complied with the installation instructions in paragraphs 36 of 41 and that's volume 12 of the – I'm talking about where do you allege they did something wrong by failing to install their products in conformance with the interior dry use spec? Because that's what they warrant. That's what they warranted in the catalog. So I looked all over in your complaint to say, well, you got to – if you don't make that warranty, how are you going to get anything for breach of warranty? And I never found it. We're not alleging that the builders did anything wrong, your Honor. They're builders of following the instructions of Simpson. Simpson says that this application, where you have these safety ties that are connecting the foundation to the home so it doesn't fly off if there's an earthquake or a hurricane or a, quote, interior dry environment so you can use the least galvanization product, which is their G90 product, which has the zinc, which is half the size of a human hair, which our experts – and this is in the records – say it's insufficient because the way these products are installed – and this is in our complaint and in the AOB, I think it's at page 7. They're installed into the concrete at an angle, 45-degree angle. So the deepest part, you have sufficient concrete cover. But as it goes up to zero, where it comes out of the concrete, you have diminishing concrete cover. So it's exposed to the chloride and the air, and it fails, and it has failed thousands of times. And Simpson knows that it has failed thousands of times. And that is a defective design. It's not the builders' fault, your Honor. I'm not saying it was the builders' fault. All I'm trying to do is I'm trying to say they said how it should be installed. They said how it should be done. You say what you say, and you never say that they were installed according to what they warranted. And that makes it pretty hard to get a warranty. And that's all I'm after. If that's your argument, I'm glad to have it. Let's go on one further. Where do you allege that while properly installed, the deterioration was not the result of environmental damage? We have alleged various... I didn't see anything in there. We have alleged that even when it's properly installed, that it is... I mean, still going to fail in... You've got to suggest that the deterioration is not the result of environmental damage, or it's out of the warranty. And I didn't find it in your complaint. And that was the worry. The language that your Honor is picking up on applies to outside... It's right in the warranty. Yeah, it applies to outdoor applications. For example, in sanctioning us at page one of the excerpts of record, page 32, the district court says, metal connectors, anchors, and fasteners will corrode, may lose load carrying capacity when installed in corrosive environments. And it mentions ocean salt there and other environments. And then it says, especially in outdoor applications. I see I've got my five minutes buzzers up. Right. That's by definition is not an interior dry environment. The warranty though does exclude deterioration due to environmental damage. I take it that's where your question is coming from. Every application in the class, it's inside concrete, Your Honor. They never say inside concrete is an issue. They say if it's outside, if it's salt there, but then they define our installation in the concrete as interior dry. And that is how it was involved. I would like... And I'm sorry to take over your time, but under UCL, here's another situation which I worried about in your complaint. Why shouldn't this claim not be dismissed because your allegations don't articulate a specific theory of unfairness under the UCL? What we... You cite the elements of a balancing test. You cite the elements of a Camacho test, but I can't tell what conduct forms the basis of your claim. Therefore, it would be hard for me if I were a defendant to even say how to defend this claim. Because Doe versus CVS Pharmacy says you've got to tell them what is the basis of your claim. And I didn't find the specific theory of unfairness. We allege that Simpson knew that inadequate concrete cover poses, quote, an elevator risk of corrosion to metal embedded in concrete. That's at paragraph 113. We allege that Simpson knew of the defect and continued marketing, selling, and warranting. We allege that Simpson knew and continued recommending the low... So are you making these allegations as it relates to the balancing test, the tethering test, the Camacho test? That's the UCL. And Doe says that the district court should deny your UCL claim, where there's just a conclusory recitation of a legal standard, but you don't clarify what conduct the plaintiffs claimed was unfair. So that's why I'm trying to get you to focus in on one of those tests. Yes. We satisfy all three tests, Your Honor. One, it is tethered to the warranty. Two, under Camacho, there is a substantial injury. Well, I think the problem is just the very conclusory nature of the allegations. But you're down to a couple of minutes, and I know you wanted to save time for rebuttal. There's one last point may I make before I sit down, Your Honor? Sure. Sure. The district court concluded, based on one sentence in a 193-page catalog meant for builders, that Simpson does not provide a warranty for the life of the home. And this is at 8 ER 1846. They focus on, both the orders focus on the first sentence that says Simpson says they can't estimate. And both district courts ignore the third sentence that says, as long as Simpson's recommendations are followed, Simpson stands behind his product performance and our standard warranty. Simpson ignored that third sentence in its briefing, and both district courts ignored it. And Simpson made up this phrase called corrosion warnings. It does not exist in any of the Simpson materials. They made it up. They put in their briefs, and the courts adopted it. And that phrase that is not in their materials, 32 times in the sanctions order, 32 times the district court says warnings. And I just, before I sit down, I need to please say, we take this extremely seriously to be sanctioned. That like you, we feel like this is a calling. We're office of the court. We're extremely serious about the sanctions. And we believe that we have a meritorious case for homeowners who were cheated. Thank you. Thank you, counsel. My 30 seconds. I'll put a couple of minutes back on the clock for rebuttal. Good morning, Your Honor. Sheridan Caldwell of Horvitz and Levy on behalf of Simpson. May I proceed? Yes, please. I'll go ahead and jump right in on standing since the court seems interested in that. As at this point in the case, it's the third amended complaint. As this court is aware, this case already went up, has already been up to this court. That was on class certification. Plaintiffs got a lot of discovery in order to bring that class certification motion. Well, counsel today referenced some expert analyses that didn't get included. I take it on the leave the men question you're saying too little too late. Yes, Your Honor. That was information that they had before they filed the third amended complaint, which they didn't file until the case was remanded back down to the trial court after it came up and leave to amend would be futile, both because plaintiffs had the information that they now claim they could have added to the complaint. They chose not to do so. Ms. Caldwell, can I ask, what about the theory of something that's inherently defective? Let's say, I was trying to think of what might be analogous to this. Let's say someone was sold a home with a cracked foundation. Is that a future harm where someone wouldn't have standing because they have to go and repair it at some point in the future, even if it might not fail immediately? Or is that a concrete and immediate injury now? It sounds to me, if on its face, all it is, is the bare possibility that the product will fail in the future. That is a mere risk of future harm under TransUnion. Even with a concrete, I mean, because TransUnion, you had these credit reports. I never saw the light of day. But if you are sold a home with a cracked foundation, you have to do something about it, right? You're not going to sit around and hope that an earthquake or something else doesn't strike and decimate your house. Why isn't this in the same boat as that in order to establish standing? Now, whether they can prove up their case is a completely different matter. But for standing purposes, why aren't those equivalent? Right, Your Honor. Well, first of all, and I think it's already been established that plaintiffs have not actually alleged that there has been any damage to their homes. But even assuming that there were, as in many of the cases that plaintiffs cited in their reply brief on standing, all of which were pre-TransUnion cases, so to the extent that they suggest the future harm is enough, that aspect of the opinion has been overruled. But even for kind of a current loss of value or overpayment theory, the plaintiffs in all of those cases allege far more than the plaintiffs here. They allege that there was a history of failure of the products, that they received less, or that they would not be able to sell their products, resell the products for as much based on that information. Well, counsel's arguing precisely that, that there have been numerous failures and, in fact, multiple lawsuits filed against Simpson and other home developers. How do you respond to that? I respectfully disagree that they've alleged that there have been any failures, Your Honor. They've identified corrosion in products in other homes. Well, they're arguing that Simpson's really unnoticed because of failures in other cases, and they point to other lawsuits that have been filed. Even by pointing to those other lawsuits, plaintiffs haven't actually identified any home where the product has failed. And by failed, plaintiffs agree the definition here is that the products are no longer able to carry their load capacity in high wind or earthquakes events. Corrosion does not equal failure, and that's explicitly stated in Simpson's catalog, which is incorporated into the complaint. Well, I think Simpson says corrosion does not necessarily equal failure. I mean, I think Simpson does acknowledge if something corrodes enough, it'll fail. It won't bear the load that it's meant to bear, right? So I guess it's a matter of degree. If these products are, if I understand plaintiff's case, they're saying that because of this low galvanized coverage, because of this not insufficient concrete cover, these are inherently defective, even if they were installed internally in the way that Simpson recommends. And that is what makes these things to prematurely fail like that. That's that's the inherent defect behind them. Right. Well, I think your honor's question, first of all, hints at an important detail, which is if they were installed correctly, which plaintiffs do not allege, actually, that they weren't installed in compliance. I mean, I wanted to ask about that. The third amended complaint talks about plaintiffs allege for each plaintiff home that the products were embedded in the concrete foundation, nailed to structural members, and covered with house wrap and exterior cladding in original construction pursuant to Simpson's installation requirements for its applicable interior dry service specifications, and that they actually do the specifications for interior application. Why isn't that on a rule eight basis sufficient to allege that they were installed according to specifications under the warranty? Because your honor, as alluded to by judges Smith and Wynne already, the warranty includes far more specifications than just that they were installed in an interior dry setting. There are four things that plaintiffs should have alleged. First, that the products were specified based on the conditions of the home and the local environment of the home. They have not done that. Second, that the products were properly specified. What is that? I mean, I sort of see this as matters of triable proof, and I take counsel's point that this is called corrosion information, and the company is indicating that there are many variables involved in what might lead to corrosion. But when I read this warning, the very first sentence says, metal connectors, anchors, and fasteners will corrode and may lose load carrying capacity when installed in corrosive environments or exposed to corrosive materials. So the entire framing of that warning is corrosive environments, corrosive materials. What plaintiffs are alleging is we're complying with Simpson's interior installation specifications, meaning a non-corrosive environment, and we installed things in this particular way. Now, again, whether they can prove up their case or not is a different question, but it seems as if for Rule 8 purposes, they adequately informed defendants the nature of their claims and what they intend to try to prove at trial. Why is that insufficient for Rule 8 purposes? Because, Your Honor, in order to plead a warranty claim, plaintiffs were required to show that the conditions of the warranty were met, that the warranty even applies here. And even just taking, even if we focus in on plaintiff's allegation of interior dry, for example, and we look at page 1846 of the record, which is part of the catalog incorporated into the complaint, and again, that's actually reproduced in the complaint at paragraph 91, that shows, has a handy little chart that shows which settings permit which type of fasteners. And here, the fasteners that issue are the low galvanization G90. So if we look at the chart, there's a row for interior dry, but if we look at the columns, only two types of wood can even be used in order for it to qualify for the low galvanization. And plaintiffs here don't even allege what type of wood was used in their home, even to show. So we're talking about something that hasn't, and I take your point, maybe class action discovery might change my mind about it, but this is pre-discovery. These are at the pleading stage, and there are, I guess, further matters of proof as to what happened in these particular homes, what kind of wood was or anything else. Your view is that the allegations that they've made for interior dry use, that for each of these plaintiffs, which reflect these interior dry use specifications, that that's not sufficient, that you would have to get into the type of treated wood that the builder used for each and every home. That seems a little bit more than what Rule 8 would require, in my view. That seems like you're getting more into, like, Rule 9 fraudulent allegations or something, that you need something more specific. Respectfully, Your Honor, plaintiffs have had discovery on this issue. So the fact that there are not more specific allegations about their homes at this point should be assumed to be intentional, most likely for purposes of class certification, so that there's less obvious differences between the homes. But even if we look past the issue about whether the conditions of the warranty were met, plaintiffs also have alleged that the warranty has been breached. They haven't shown that, going back to my discussion with Judge, when there has not been any identification of any products that have failed in any home, plaintiffs make conclusory allegations that the products have failed in homes. But even in doing so, they point only to pictures of corrosion. What about the Hicks case? Just whether the Hicks case applies. For properly alleging a breach of the express warranty. Why isn't an inherently defective product that is substantially likely to fail over its useful life sufficient to allege a breach in that circumstance? That's, first of all, not the test that California courts have applied when actually looking to what a plaintiff needs to show on the merits. But even under Hicks, plaintiffs have not identified either an inherent defect, because they haven't connected the dots between corrosion and definite failure. Even the documents incorporated into the complaint show that it is possible to stop corrosion. Exhibit 3 discusses mitigation of corrosion and how that can be stopped or reversed. So corrosion does not necessarily equal failure, so there's no defect. And then plaintiffs also can't show, even if there was a defect, that it's substantially certain to manifest in their home, what Hicks requires. Because, again, if these products are installed in thousands of homes and we have no insight or identification of any of them, much less a high number of them, that have failed, certainly none of the products in plaintiffs' own homes have failed, then there's no indication that for each of these plaintiffs, it is substantially certain that they will fail. In your view, pointing to the other cases in Hawaii or California, these other ones that are also pending, would not be enough to show, at least for plausibility purposes, that failures have been happening on a mass level? Right, Your Honor. Certainly not in terms of a failure of the product itself. Most of those other lawsuits are actually against the builders of the home, alleging that the products were not properly installed. And that's both an issue for Article 3 and for plaintiffs pleading of both of their claims as a traceability problem, because plaintiffs haven't alleged that the products were properly installed in their homes under the correct conditions. The district court had pointed out that the vast majority of those other lawsuits were against developers and builders for improper installations. Does that mean that there were no inherent design defect claims against Simpson in those other cases? I'm not aware of the specific allegations in those cases, but my understanding is that they were focused on misinstallation. And that's really actually more of what the record points to here. Improper installation. In the Gentry case, which is the one out of Hawaii, there was a question of fact determination as to the design defect question. Was that ever settled in that other case, one way or the other? I apologize, Your Honor. I don't know the answer to that question. But certainly here, plaintiffs could have, if there was, if there were favorable conclusions drawn in that case, those could have been included in the third amended complaint. They weren't. Plaintiffs, again, if anything, have pointed to allegations that suggest that if there was corrosion, it was due to misinstallation of the products. Can I turn you to the Rule 11 sanctions issue? I was having difficulty trying to understand what about the first amendment complaint was sanctionable versus the allegations in the third amended complaint. And so I was I was looking very carefully at this corrosion information description, which seems to be a large part of the basis behind it. It and I and I had read that first sentence to you before. It seems to me that the magistrate judge was dipping into what might be a more triable question as to whether plaintiffs are adequately alleging if if something corrodes in a corrosive environment, whether that should extend to a non-corrosive installation. In other words, it's not necessarily inconsistent. Plaintiffs' allegations are not necessarily inconsistent with this corrosion information that even if you follow Simpson's instructions for internal dry use installation, their claim is that because this galvanization coating is too thin, it's going to prematurely corrode and and cause more failures. Even when you're even when you're installing in a non-corrosive environment, why this warning doesn't seem to speak to that question, much less make it baseless. Why why was it appropriate to sanction plaintiffs for those allegations? Plaintiffs did make statements that were flatly contradictory to the catalog information. Like what, for example? For example, the fact said that the warranty led homeowners to believe the products were, quote, capable of resisting corrosion for the entire life of the home, when in fact the catalog says it is common to see some corrosion on connectors. The presence of some corrosion does not mean that load capacity has necessarily been affected or that a failure will occur. But I mean, but I take your point. At the same time, plaintiffs are also talking about a difference between interior versus exterior. And plaintiffs make this point that if these things are being installed at the foundation, concrete is poured over and then they put up drywall, like you're you're not inspecting them again. You're not maintaining. There's no expectation that you're going to replace them. And so it's just it's stuck there. And so plaintiffs argument is that's basically coextensive with the foundation itself. Why why is it baseless to argue that that would mean that the warranty extends to the life of the foundation? Even though I take some point that, no, it's not. We said we can't predict the useful life of this product. Why is that a basis for a sanctions order as opposed to disputed questions of a fact? Respectfully, Your Honor, under the abuse of discretion standard, the trial court did identify a number of issues with the complaint. If the court is concerned more about whether plaintiffs have connected the dots between corrosion and failure, I'd be much more interested in exploring that on the merits rather than the sanctions question. Well, but only I mean, the only reason why, you know, we see all the time inadequate pleadings. You file, you know, people have a complaint. It's not good enough. The court allows it to amend. And in this case, it was amounted and amended three times. It's unusual to me to see a sanctions order or over an earlier complaint when what I see in a later complaint are not too dissimilar allegations to what they were ostensibly sanctioned for. So I'm just I'm just scratching my head as to why the court decided to sanction someone for what may not have been the best written complaint in the first place. And why isn't that an abuse of discretion? I don't want you to miss answering this question. But the thing that worried me a little bit about this district court order is that the award was based on the declaration of defense counsel and appropriately. And then the court reduced the award by half. So I think it's quite important to answer this question because really, the award only came because there was a declaration of defense counsel. Now, I'm not sure you were the defense counsel, but whoever that defense counsel was made, if you will, the declaration that the magistrate court reviewed it, reduced it by half. That's why I think this question is important. And I was prepared to ask you the same question. For your honor, both of your honors, the first round complaint, again, although it does echo similar themes to what are now in the third amended complaint, the third amended complaint is still deficient on most of the same points. But the first amended complaint didn't even include any information about, for example, which products were installed in plaintiff's home, what the definition of the products at issue were. It, I believe, included a hyperlink to the catalog, but it did not actually quote or acknowledge the warranty claims itself. So there were a number of reasons that the complaint was factually baseless. But again, I'd be much more interested in discussing why those are still present in the current version of the third amended complaint, and those are insufficient both for standing purposes and for purposes of plaintiff's claims. If the court found that the declaration was insufficient, even under this deferential standard of review, we would understand. But on the merits, plaintiffs still have not shown that even though now they've said they have looked and they said they can see these products are in their home, they have not done any testing to identify, or if there was testing, they intentionally have not included it in the complaint at this point, about whether there was any corrosion on their own homes, whether there's any environmental factors that affected those homes, and whether that can be traceable actually to Simpson's actions. Can I ask you one last question? Can you just briefly tell me what was in the nature of the class action, the class discovery? What kind of information was disclosed during that discovery process? There was actually testing done of plaintiff's homes, and this is in the record of actually the last appeal, obviously, because that was up on class certification. There was testing of plaintiff's homes. I think the court can draw its own conclusions about why those were not included in the third amended complaint later. There was also expert evaluations of the sites of the homes, and I believe also whether we would expect that these products would fail moving into the future. So in conclusion, we respectfully request the court affirm. Thank you. Thank you, counsel. Very quickly, Your Honors, at paragraph 123 of the complaint, we say that this product has failed in the same way in thousands of homes for well more than the last decade. In paragraph 127, when we talk about the Gentry case, my co-counsel were in the Gentry case. We say they sued Simpson. That was the focus of that case, the design defect. You're talking about the Hawaii case? Yes, Your Honor. So at one point, there was a trial question, a fact on the design defect question. Was that issue ever settled in that case? No, the case was settled, Your Honor. Simpson settled, but concern the same... No finding, Your Honor, but it shows the knowledge, which goes, among other things, to the unfairness. Our expert, Paul Brown, did find damage at each of the plaintiff's homes. This is seven excerpts of record at 1421 and eight excerpts... This is outside the complaint? It is outside the complaint, Your Honor, and under Keegan, the court should take after acquired evidence into consideration in looking at the sanctions. We're in a very unusual posture here, where the district court who sanctioned us for the first amended complaint allowed us to proceed with our claims for express warranty and UCL unfairness in the second amended complaint. And then in the third amended complaint, all we did was change some plaintiffs because some of them were, frankly, chilled by the sanctions order, the third amended complaint, and then another district court decided we hadn't stated the claim. It makes no sense, Your Honor, respectfully, makes no sense, and we would urge the court to please reverse, at the very least, allow us to amend because we did not have four bites at the apple, Your Honor. We filed an amended complaint before there was ever a motion to dismiss. And then in the second amended complaint, our claims were upheld. And then the third amended complaint, the same claims were thrown out. So in fairness, we should have been allowed leave to amend. Thank you very much for your time. We appreciate it. Thank you very much, both of your arguments this morning. It's been very helpful. The case is submitted and we are in recess until tomorrow morning at nine.
judges: SMITH, NGUYEN, SANCHEZ